Petitioner v. Federal Energy Regulatory Commission et al. Mr. Brenna for the petitioners, Ms. Pacella for Respondent FERC, and Mr. Caldwell for Respondent Intervenor. Good morning. May it please the Court, my name is Robin Brenna and I'm here on behalf of Tesoro and Anadarko. We're here about pooling. Pooling is generally unlawful because it's inherently anti-competitive. FERC now requires federal and state pooling of revenues and costs among the three carriers on TAPs. In doing so, FERC has restructured the competitive landscape for TAPs and eliminated competition. This morning I hope to persuade this Court of three core propositions. The first one is that FERC exceeded its jurisdictional authority under the Interstate Commerce Act in mandating state pooling. The second is that even if somehow FERC has jurisdiction over state pooling, which it does not, there is no legal, regulatory, or logical justification for FERC to mandate state pooling to achieve just and reasonable federal rates. And the third proposition is that in its rush to approve a settlement in this case, FERC ignored the record before and gave lip service to the requirements of 5.1 under the ICA that are necessary to be met to approve pooling. I do not believe that there's any reasonable way to read the jurisdictional sections of the ICA, section 1.1, 1.2, and 1.3, not to be clear that they're only related to common carriers engaged in federal commerce. Section 1.1 states the Act covers only common carriers engaged in federal transportation. 1.2 explicitly excludes state transportation from the Act unless otherwise provided. What does that phrase, unless otherwise provided, mean? Doesn't 5.1 fit as otherwise provided? No. In fact, 5.1 doesn't expressly state that as otherwise provided. In fact, in 3. Do you have any cases that say that FERC's interpretation is wrong, that FERC cannot look at system-wide costs when determining its jurisdiction? I believe that the courts have consistently drawn the line in the dual regulatory scheme for decades, separating out, making the jurisdictional separations that are necessary before asserting jurisdiction. And I believe that from Smith to the Minnesota rate cases all the way up to FERC's own holding, that they said with regard to TAPs that they would require an express preemption under the ICA by Congress before they could regulate state commerce on TAPs. That's exactly what they're doing here. I think the law has been consistently applied. What about the case, it's a case that actually you cited in your brief, but it would seem to go the other way on this jurisdictional issue, the County of Marin, the U.S., and the Supreme Court. That was a case where the Supreme Court was interpreting Section 5.2, and the court held that there was no acquisition within the meaning of 5.2. There was a question as to regulating an acquisition of one bus line by another bus line. And since they said this wasn't really an acquisition under 5.2, there was no jurisdiction of the Interstate Commerce Commission, this was back in the 50s, but they said this is not to say that the ICC could never have jurisdiction over the transfer of intrastate operating rights along with the interstate operations of a carrier as long as you fell within Section 5.2. Doesn't that language hurt your position? No, I don't believe so, Your Honor. I think that the cases concerning sort of incidental impacts of regulation don't have a place here. This isn't a situation where FERC is doing something that it needs to do for federal regulation and inadvertently crosses over the line and has to impact state commerce to do it. This is a case, in fact, quite the opposite. In fact, quite the opposite. The way FERC sets just and reasonable rates is it goes through a jurisdictional separation process first, and it sets the just and reasonable rates in the underlying cases based only on federal costs. So for now, for it to go in and decide that in order to achieve that purpose, it needs to cross over and start to regulate state commerce, there is no reason for that at all. So, no, I don't believe the incidental impact series of cases has any ruling here. This is direct regulation of state commerce. I wanted to mention that all the specific enabling statutes of the ICA are interpreted within the context of the jurisdictional provisions of 1.1 through 1.3, and the language of 5.1 specifically provides that it's common carriers. It relates to common carriers subject to this chapter, which brings in the jurisdictional section. So 5.1 expressly provides to the opposite and pulls in the jurisdictional provisions. This settlement agreement doesn't affect in any way state authority, does it? The issue before the court, I believe, is whether or not the FERC exceeded the scope of its jurisdiction under the Interstate Commerce Act. So that's a red herring. That issue is not decided. I mean, there may be no state laws whatsoever, and it doesn't mean the FERC can then occupy the field that it was expressly barred from occupying. State commerce was left off limits. It was fenced off limits. And in similar cases, the court has recognized that. So I don't believe that conflict with state law is the appropriate standard at all. What about the idea that to do this in the most economically rational way, you should be taking account of all the costs? The most economically rational way is to take into consideration the costs that impact the federal just and reasonable rates. And these costs have been separated out and don't have anything to do with establishing a federal just and reasonable rate. State commerce does not influence the federal rate-making process. And regardless of this issue, that doesn't mean that they comply with 5-1, Your Honor. Okay. Well, I was saying that the specific provisions of the ICA have consistently been interpreted with the jurisdictional sections. For example, Section 1.5 of the Interstate Commerce Act requires that all charges for any service must be just and reasonable. Those have been held to be the federal rates concerning the federal commerce. Section 1.6 requires common carriers to file rates for transportation. Those have been held to be restricted to federal commerce and federal carriers. 3.1 makes it unlawful for any common carrier subject to this chapter to grant an undue preference. Those have been held to be restricted to federal carriers for federal commerce. 15.1 grants the authority to determine whether any rate, fare, or charge is just and reasonable. That's only been applied to federal carriers and federal commerce. 15.7 provides that a new individual or state rate can be suspended in refunds if it's unreasonable. Those have only been applied to federal commerce and federal carriers. The relevant cases on this are overwhelming, I believe. What do you, anticipating FERC's response, what do you do with their argument that you can't achieve the benefits of a pooling agreement here if you exclude the interstate cost? I mean, clearly the statute allows pooling agreements. I mean, they're disfavored, but under certain circumstances, they're allowed. And I think FERC's argument is going to be that to have an effective pooling agreement here, you must include the interstate cost. Is that right as a matter of fact? And second, if it is, what effect does that have on your argument? No, it's not right as a matter of fact. You don't need a pooling agreement. Let's imagine you need a pooling agreement. You don't have to pool state costs to get a just and reasonable federal rate. Why is that? Because if there is a disparity under the federal rates, you separate out, you do jurisdictional separation. Your basis separates the federal rates on federal costs. So from the foundation up, you are only taking into consideration, you allocate those. In the case of TAPs, they're jurisdictionally allocated on a barrel or barrel mile basis, depending on whether they're distance or non-distance related costs. So the agencies go through and have for decades great efforts to separate the costs into two buckets. Now, if the rate that's established in the bucket doesn't collect federal costs correctly, then their best argument would be that you need to somehow pool the collections to reallocate those to make the federal rates right. That exercise has nothing whatsoever to do with pooling federal costs, pooling state costs. They just aren't logically linked at all. If there's a disparity caused by federal rates that FERC wants to correct, then one mechanism, their argument would be you need to federally pool. You don't need to go look in the other bucket. You didn't base your rates on those other buckets. There's no reason to be in that other bucket for any reason at all. And if there's a problem with your rate setting on the federal side, you don't make it up on the state side. That's not what you do. Let me just make sure I understand factually your contention. How does one know whether to apply an intrastate rate versus an interstate rate? It goes to the underlying nature of the commerce. In the case of TAPS, it's the ultimate destination for the oil. There is no dispute in this case at all with regard to which is state and which is federal commerce. There is no dispute in this case, nor in the underlying cases, as to how the allocation should be done between state, cost allocation should be done between state and federal commerce. When you say the ultimate destination of the oil, how is that determined? You nominate the oil on the line. My client nominates a barrel of oil at Pump Station 1 for its refinery in Alaska. It's a wholly within Alaska, solely within Alaska movement. It's a purely state commerce. Even if all of the oil traveled in that fashion, and that was the intent of the pipeline, was only to carry oil in the way that your client does it, wouldn't they still be carriers under the statute because of the nature of what, because the statute says you're a carrier if you're transporting oil? Yeah, if you're transporting oil in federal commerce, you're a carrier. That's what the definition in 1.3, that's the way it defines a carrier. It has to do with the carrier as defined herein and herein as a federal carrier and federal rates. The Texas case is directly dispositive at this point. That was a case in which the abandonment provisions of the ICA were an issue, and most of the volume was on the federal side. So they went to FERC and asked for abandonment, and FERC said okay. And the question became whether or not they needed to ask for state abandonment as well because some of the volume was in state. And they clearly held that because in applying the abandonment provision, that because you're a federal carrier doing something in federal commerce and you wanted to abandon that service, that didn't mean that if you were a state carrier in state commerce you could abandon that service. So no, the definition is quite restrictive. It is a federal carrier which is defined as someone conducting federal commerce, and only a state carrier can conduct state commerce, and only a federal carrier can conduct federal commerce. We'll give you a couple of minutes back. Don't worry. Okay. All right. Thank you, Your Honor. We'll give you more than a couple. We'll give you five minutes back. Okay. I guess I can't answer. We have your argument. We'll give you time. Oh, in rebuttal. In rebuttal, yeah. Okay. Thank you, Your Honor. And if there's no further questions at this time, please. Good morning. Good morning, Your Honors. Beth Pasella for the Commission. What the Commission had before was a settlement agreement that it found met the statutory and regulatory standards for approval. The pooling settlement would minimize over or under recovery of costs, and at the same time it would provide ample incentive for the carriers to discount. This was not what Petitioner was intimating, meaning that the Commission is forcing this on the petitioners, while in 502 the Commission did say that it did want a pooling. That's not what is before the Court here. What's before the Court here is a voluntary pooling agreement that was presented that includes, just like happened in the 1985 settlement. It was a voluntary agreement with the interstate carriers, right, not the intrastate carriers. They are both the interstate and the intrastate carriers. They happen to be both. They're the only carriers on this pipeline. They're the same people. So they are intrastate carriers, as Judge Wilkins was pointing out under, if you look at Section 11B, it says, the provisions of this chapter shall apply to common carriers engaged in the transportation of oil by pipeline. So that is who these TAPs carriers are. They are carriers, and therefore then when you turn to ICA Section 5.1, it says it provides the Commission authority to approve pooling of any of the gross or net earnings or any portion thereof of such carriers, which are common carriers. What about your opponent's argument that it's only federal carriers, so to speak, engaged in interstate transportation, not intrastate transportation? I will say that they, as we pointed out in our brief, they did not raise that issue to the Commission at all. They certainly had notice of that issue, and the Commission didn't have an opportunity to address that. But in any event, it's not correct. It is the provision that I was just reading to the court, Section 11B, is at, I think it's plain, but if it's interrelationship with Section 5.1 is anything, if it's not plainly that the Commission is correct, then it's at a minimum ambiguous, and the Commission gets deference in interpreting that. And that is a reasonable interpretation. Because this is somewhat confusing to me because the pipeline is entirely within the state of Alaska, right? Yes. It begins in Alaska, it ends in Alaska. But your opponent points out that, well, you look at the final destination of the oil to determine whether you apply an interstate rate versus an intrastate rate. Yes. But you would maintain that whether you're applying either rate, or still acting as a carrier that's subject to regulation under the ICA? Sort of. For the specific circumstances here, all I'm saying is that the statute allows the Commission to approve a pooling that proposes to include interstate costs, certain interstate costs, after movements have already occurred on the fictional intrastate side of the pipeline. So Alaska is still setting the rates for those movements. Alaska is still setting the rules under which those movements occur. And it's only after those movements occur that in order to address the skewing that would occur otherwise. Now, again, the Commission didn't say you need to include these intrastate costs. It was the tax carriers that came in and said, if we don't include these intrastate costs, you won't actually be accomplishing what we intend with this to deal with the under- or over-recovery. Because you can be a carrier who over-recovers on the intrastate side, but under-recovers on the intrastate side, and so you end up not resolving the under- or over-recovery to the extent that the Commission wants to. It doesn't want to fully resolve over- or under-recovery because it wants to leave this incentive for the tax carriers to discount. And so it leaves out, it approves the settlement that leaves out 25.1 percent of all tax costs. But there are certainly intrastate movements, and that is respected here. 25 percent is left out. What if intrastate was left out? What percentage does that then become? What I've read in the record is it's about 10 percent of all tax costs. That wasn't really fleshed out, Your Honor, to the extent that it would have been convenient for me to give you a very clear answer. What I'm getting at is the way you phrase it, it sounds as if the parties, when they settled, thought that the intrastate costs were indispensable. Exactly. And I'm just trying to understand why that's the case. What they've explained to me, and I think my colleague can explain that a little bit better about the skew, because, again, that wasn't really, that wasn't the Commission. The Commission wasn't finding this is necessary. It was finding it was necessary to consider these costs to end up with a JNR settlement, and it did do that. But it didn't propose it on its own. I don't know what the Commission would have done if it had on its own set up a ruling and said whether it would include it or not. But what it found was it was reasonable to do that here, particularly because Alaska wasn't upset. But I think it's about – Why does that matter? I'm sorry. It matters because Alaska is a really active participant in tax cases. It was in the hearing below. Right, but it doesn't matter for the jurisdictional limitation that the state in question is okay with it or not okay with it. It matters, Your Honor, because I see what you're saying, that they can't waive their jurisdiction. I get that. But the point is they're not waiving their jurisdiction. They recognize that it doesn't affect their jurisdiction. For example, in Order 34 that's cited in the briefs, the 2004 Alaska order, Alaska was asked to include the intrastate pooling costs that were included in 22F in the 1985 settlement. And Alaska said we're not going to include those in your rates in determining what your rate should be. So where it could have impacted the state's rates, the state still had the ability to say no, we're not going to include those intrastate pooling costs in your rates, which would increase your maximum rate. I guess the response is that in setting the rates here, the federal rates, there are costs being included over which FERC has no authority. To answer that, Your Honor, I would point to this court's holdings in Transmission Agency of Northern California, MTG&E, and I have not cited those in my brief, and I apologize for that. It did not come up until my new court when someone recognized that this is very similar to that but less. And those are 495F3-663 and 306F3-1112. And that involved the city of Vernon, which was a non-jurisdictional entity, that wanted to be part of a regional transmission organization. And what the commission did was look at those non-jurisdictional entities' rates, and some, in the first case, some amorphous standards to make sure that they were kind of a commission. I think it was probably uncomfortable in actually looking at the rates for whether they were just and reasonable. And this court sent it back to the commission and said, those rates affect the justness and reasonableness of your federal rate. You have to look at them, and you have to tell us what standards you're going to use. And the commission came back in this second case, which was Transmission Agency case, and said, we're going to use the JNR standard, and we're actually going to look at these non-jurisdictional entities' rates because they affect the federal rate. So you think they had to be included here? I think you said that they – I think the reason I keep bringing that up is because it was something that was presented to the commission as a settlement. This is what we, the tax carriers, have decided we think is necessary for us to have appropriate recovery, not too much under-recovery, not too much over-recovery, and retaining the incentive to continue to discount at the same time. So then the commission looked at what was presented to it, found that it did give proper incentive, and it would allow for the appropriate level of over- and under-recovery, still retaining some incentive, ample incentive, the commission found. So I don't know what the commission would have done if it had created the pooling is what I'm saying, and I don't want to speak for the commission as them saying, this must be in there as precedent, that you always have to include it. But in this particular circumstance, you know, tax is weird. It's unique. It's not like – Didn't the FERC trial staff object to this? Am I remembering that correctly? FERC trial staff originally thought that not only interest rate rates shouldn't be in, but that other rates, portions of the cost shouldn't be in as well. But they changed their mind and did not oppose the settlement agreement. There was all kinds of stuff. The proposal that was really at issue at the hearing level was essentially full cost, and that's what all the testimony was about. And, of course, that's nothing like what's been proposed here, which, you know, and as the commission found, this is virtually identical to 2-2-F, which worked well for over 20 years. So not only did the commission find that it met the statutory standards, but there was precedent for approving a settlement like this. When you say it's unique, I guess a ruling against you would have no collateral effects then? It would – certainly it would on tax. But, no, I think that you can – of course, I would prefer if you looked at it the opposite way. No, I understand that. A very limited circumstance. That this – I think that the transmission agency and PG&E cases were not tax cases. So those were FPA 205, 206 cases, whatever. So the general principle isn't that. But, sure, my point is that this is – it's an odd circumstance where you have – you have a pipeline that has multiple carrier owners. You don't really know who's running what. You don't know where you're getting your – so there's this fiction that's created that says, all right, these are interstate volumes, these are interstate volumes. I think, Judge Wilkins, you're – I don't want to say confusing because you're not confused. This is complicated and this is odd. It's not like a regular pipeline where you really understand whose pipeline it is and what it's serving. So these tax carriers are interstate carriers and interstate carriers. But they are, for sure, Section 1B carriers for purposes of this chapter, and therefore Section 5.1 applies and allows them to include their interstate rates. How do we know when a carrier is an interstate carrier as opposed to an intrastate carrier? I think my point is they're always an interstate carrier, and perhaps they're always an interstate carrier. I don't know. But they're always an interstate carrier. It's just sometimes their volumes are not going in interstate commerce. The Commission would not for sure here say that it could then take another step and determine that it has to look actually at the rates. I mean, it's not even doing the same thing it did in PG&E and Vernon. So it's a step closer. It's just considering the costs because it's necessary to make sure that there's proper prevention of over and under recovery, and let's not forget why that matters. I mean, that was really the whole premise. How do we keep tax going for the future? That benefits everybody. These carriers, if they continue to under-recover, they're not going to continue to want to invest in tax, and that's not going to help anybody. It just won't be around. Thank you. Mr. Caldwell. I'll dispense with what I was going to say previously, Your Honor, and go right to the questions. May it please the Court. I'm Charles Caldwell, appearing on behalf of the TAPS carriers, who are interveners in support of the respondents. First, I think in response, I believe, to some of the questions that have already occurred, I think it's important to step back and look categorically at what this settlement involves. Pooling does not involve the setting of rates, neither on the federal side at FERC or on the state side with the Alaska Commission. Pooling involves, after rates have been set, after volumes have flowed, a series of payments and receipts between the carriers to address the fact that the ownership of TAPS doesn't align with the revenue collection of the owners. That disconnection, that divergence, creates cost over-recoveries and under-recoveries among the carriers, and that is exacerbated with a uniform rate requirement that was mandated. What this settlement does, it says that for 75% of the cost, and back to a question I think Your Honor raised about how much of the interstate and intrastate costs are pooled, it's the same in both. Under the settlement proposal, it would be 75% of the interstate costs and 75% of the intrastate costs are pooled. Those don't affect how FERC or the Alaska Commission set rates for the carriers, interstate or intrastate. What it goes to is a reallocation of revenue among the carriers, the pooling of that revenue, to not completely resolve, as counsel said, but to mitigate that difference, which has long-term benefits in terms of financial stability of TAPS and investment incentives for the TAPS carriers. So it's important to, I wanted to start off by making that distinction. Your Honor, as to your question about interstate versus intrastate, I'm very sympathetic. Having practiced in this area a long time, interstate jurisdiction is something you can spend a lot of time on. In TAPS, the reason that this entirely inside the state of Alaska movements gets separated is because shippers nominate. And for those shippers who nominate down to the Valdez Terminal to go outside the state, i.e. down to California, those are interstate barrels because they're going to move by water and then into another part of the United States. For those barrels that stay in the state of Alaska, there's a mid-system delivery point, and then you can take deliveries in Valdez and move them to other points in Alaska. Those are intrastate. So I just wanted to clarify that, Your Honor. What effect should we give the fact that it appears that the Alaska Commission has also mandated uniform rates? It reinforces this point, Your Honor, because the reason the uniform rates matter, whether you're talking on the interstate or the intrastate side, is that it limits the ability of the carriers to vary their rates to address these disconnects between cost incurrence and cost recovery. So it's a factor here. Fundamentally, the reason that, and it goes to, I think, a point that a number of questions have raised, is that in approving the settlement pool, FERC is not attempting to regulate intrastate commerce. And let me explain myself. It is not attempting to regulate how the Alaska Commission chooses set rates. The costs that were being discussed by Respondents Council were, in fact, those pooling payments. Can the carriers seek to recover in their rates, interstate or intrastate, the payments they were making? And the Alaska Commission said, no, that's a side point. It doesn't go to the costs of TAPs that are used in designing rates, whether inter- or intrastate rates. So what is going on here is entirely separate from rate making. FERC, in approving this pool, is not interfering with the Alaska Commission's sphere, which is to set intrastate rates. Nothing that happens in the pooling process, the exchange of revenues, the reconciliation of revenues, to deal with that divergence between cost incurrence and cost recovery, has any effect on the pool of costs for running TAPs that are recognized and setting the rates. It is a transaction between the carriers, after the fact, readjusting revenue. And not all of it. I want to make one point about the exclusion that I think is crucial. We talk about it as a 25% exclusion. Not so much the percentage, which is substantial. It means the carriers are only assured, and I'm sorry, I'm running out of time. Thank you, Your Honor. The carriers are only assured through the pooling process 75% of their costs. The 25% we're talking about, what matters is, what are the categories of those costs? There's two. The entirety of the costs that each of the carriers incur directly in managing TAPs, what's called the carrier direct costs. Those are entirely excluded, incurred by each of the carriers. The other huge category is the entirety of the carrier's return is excluded. That's what creates the incentives for the carriers to continue to compete. If a carrier sat back and said, I'll just take my pooling payment, all that means is the costs incurred by Alyeska, the operating company that they own, they'll get those recovered. But they will earn no return on their investment in TAPs. That is categorically a massive exclusion and creates appropriate incentives. If no further questions, thank you, Your Honor. Mr. Brenner, we're going to give you the full five minutes you asked for. Thank you, Your Honor. I want to be clear that there's no confusion as to what a carrier is. A common carrier under the ICA, under 1.1 of the ICA, it refers to carriers within federal commerce. It's right in Section 1.1, carriers subject to regulation. The carrier isn't transporting in federal commerce under 1.1. He's not subject to regulation. To make that even more clear, under 1.2, it specifically excludes transportation only within the state, which is what we're talking about here. And to make that even more clear, under 1.3, it defines common carrier as someone engaged in such transportation. If they're not engaged in that transportation, they do not meet the definition of a federal carrier. Isn't transportation referring to transportation of people? What's that? Isn't that transportation referring to transportation of people? No, in fact, there's a case that I think we cited that it's talking about transportation for hire. It's not limited. And it has been applied to pipelines. So, first, let's not confuse. Under their theories of the ICA's jurisdictional scope, there's nothing that would prevent FERC from starting to set rates because these are common carriers that just inadvertently are moving that are regulated under the act. Why can't FERC just start regulating state commerce? Regulating the intrastate rates? I don't see that implication from the position. Well, I think that if you take a look at the ICA. And we can make that clear as well, but I don't see why that necessarily follows from their position. Well, their position is that carriers are carriers and it doesn't matter what they're doing. And the ICA provides for FERC regulation of them. That's their position. And if that's true, then anyway. Well, the carriers are definitely involved in interstate commerce, correct? Yes. Well, oftentimes. No, I know. But just here, yes, they're involved in interstate commerce. And the point is that what costs are going to be pooled in terms of setting the interstate rate? Absolutely. That's the issue. And in setting the federal rate, there's no reason to even. . . They're interstate carriers and it's an interstate rate. The question is just what components, what things are we going to allow FERC to look at in terms of setting the interstate rate, right? Well, not look at. . . they're mandating state pooling. Well, factor in, yes, factor in. Approve the settlement agreements. They're not looking at state commerce to decide how to regulate federal commerce. They are coming in and regulating state commerce. And let there be no doubt. What do you mean by that, the word regulate? You're putting a lot on the word regulating there. Well, let me just give a practical example. Before this pooling order, 100% of my client's state oil was moved on a competitive rate, 100%. After this order, 100% of my client's state oil is being moved on a noncompetitive rate. That's been the impact here. This isn't. . . you know, they say. . . How did that happen? Tell me. How did that happen? Well, we learned at hearing that if the pooling was permitted, that there would not be competitive rates for state commerce if pooling included state costs. So that's what happens. They have no incentive to compete. There was a robust competitive environment on TAPS for state commerce. And FERC set a federal rate and then said they needed to pool to balance out disparities in the federal rate. So it's been a collateral effect of what FERC has done has been to impact the intrastate rate, correct? No, Your Honor. There's nothing collateral about it. If they had said we're going to pool federal costs, there may have been some collateral effect on commerce that would fall under an incidental or collateral type of analysis. But when you go in and say we're setting federal rates and we're going to base it on state costs, that is no longer. . . you're not setting federal rates. You're going over and you're changing the entire competitive landscape for state commerce completely unnecessarily to get to a just and reasonable federal rate. You don't even need to look at those costs. And no one has articulated a reason why they should. Well, yeah, they have to prevent over or under recovery. I know you disagree with that, but they have at least articulated that. Well, no, I disagree. If there's an over or under recovery from state commerce, that is a state concern. That's not a federal concern, and that's the core distinction. Right, right. They can't say, well, the state has a problem too, so let's go pool over there. Just like they can't disregard their rates, they can't go into that commerce and regulate that commerce. It's not incidental. It's not accidental. It's direct. I wanted to be clear. The Alaska Commission specifically allows individual rates to be filed and doesn't have a uniform rate requirement. And that's another reason why state pooling makes no sense at all. FERC's sole thin thread of justification for pooling, which is inherently unlawful, is uniform rates. On the state side, there aren't uniform rates. I argued for uniform rates on the state side, and I lost. And they are misreading that order terribly. I lost, and what the RCA said was, if you want individual rates, come in and file them. And, in fact, they haven't filed an individual rate, though they've had a right to, for a decade. Now, if there's any harm arising out of uniform rates, it should have been apparent, and they should have filed individual rates. They've had individual rates in effect. They've had the opportunity to file individual rates for a decade on the state side, and they haven't filed them once. And then I think it's also important, aside from that entire decade where they could have filed individual rates and didn't, that from 2008 until 2012, there was no pooling. There was no pooling. There hasn't been any impact on TAP's operation, and part of the problem is that FERC has not articulated. When you talk about the 5-1 standards of benefit, there has been no benefit to service. There hasn't been any change in the service whatsoever. There hasn't been an economy of operation. The economy of operation has all the pooling does is take costs from the most efficient provider and give them to the least efficient provider. That's also called competition, and pooling just undoes that. And then with regard to the undue impact. Last point. Last point. Okay. With regard to the undue impact on competition, the record is unequivocal in this case that the impact of this has been to eliminate state competition, not an undue impact, a complete elimination of competition in state commerce. Okay. We have your argument. Thank you very much, Mr. President. Thank you.
judges: Griffith, Kavanaugh, Wilkins